```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION


 3   PARALLEL NETWORKS          )
                                )    DOCKET NO. 6:10cv111
 4        -vs-                  )
                                )    Tyler, Texas
 5   ABERCROMBIE & FITCH CO.,   )    10:30 a.m.
     ET AL                      )    March 1, 2011
 6                         **********
     PARALLEL NETWORKS          )
 7                              )    DOCKET NO. 6:10cv112
          -vs-                  )
 8                              )
                                )
 9   BENTLEY MOTORS, INC., ET AL )
                         *************
10   PARALLEL NETWORKS          )
                                )    DOCKET NO. 6:10cv275
11        -vs-                  )
                                )
12   AEO, INC., ET AL           )
                         **********
13   PARALLEL NETWORKS          )
                                )    DOCKET NO. 6:10cv491
14        -vs-                  )
                                )
15   ADIDAS AMERICA, INC., ET AL )

16

17              TRANSCRIPT OF STATUS HEARING
            BEFORE THE HONORABLE LEONARD DAVIS,
18             UNITED STATES DISTRICT JUDGE

19
                  A P P E A R A N C E S
20

21              (SEE SIGN-IN SHEETS)

22   COURT REPORTER:       MS. SHEA SLOAN
                           211 West Ferguson
23                         Tyler, Texas  75702

24
     Proceedings taken by Machine Stenotype; transcript was
25   produced by a Computer.
```

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Please be seated.
 3              All right.  Ms. Ferguson, if you will call the case,
 4    please --
 5              THE CLERK:  Court calls --
 6              THE COURT:  -- cases.
 7              THE CLERK:  Yes, Your Honor.  Court calls Cases No.
 8    6:10cv111, Parallel v. Abercrombie; 6:10cv112, Parallel v.
 9    Bentley Motors, et al; 6:10cv275, Parallel v. AEO; and the
10    the last case, 6:10cv491, Parallel v. Adidas, et al.
11              THE COURT:  All right.  Let me have announcements.
12    If you are representing parties in more than one case, just
13    make that designation -- answer in all of the cases saying
14    which cases and which parties you are representing.
15              So, Plaintiffs?
16              MR. TADLOCK:  Thank you.  Good morning, Your Honor.
17    Craig Tadlock for the plaintiff, Parallel Networks in all four
18    cases, of course.  With me is our Lead Counsel Mr. George
19    Bosy.  And also Mr. David Bennett from Bosy & Bennett.
20              Also with me is Mr. Terry Fokas of Parallel
21    Networks.  Mr. Fokas is also a member of the bar of this
22    Court.
23              With the Court's indulgence, Mr. Bosy will be our
24    primary spokesperson today.  We are ready to proceed.
25              THE COURT:  Okay.  Thank you.
```

```
 1              MR. JONES:  Your Honor -- excuse me, Your Honor.

 2   Mike Jones in the 491 case I represent American Suzuki Motor

 3   Corporation with Mr. Matt Moore and Mr. Allen Gardner.  Also

 4   in that case I represent Bergdorf Goodman.  Also in that case

 5   I represent General Motors.

 6              With regard to the 275 case, I represent Redbox

 7   Automated Retail.  And in that case I also represent The

 8   Neiman Marcus Group.

 9              And, Your Honor, I work with a number of other

10   National Counsel that are here in those cases.  In the

11   interest of time, I will let them introduce themselves.

12              THE COURT:  Very well.

13              MR. JONES:  Thank you, Your Honor.

14              MR. CORDELL:  Good morning, Your Honor.  Ruffin

15   Cordell with Fish & Richardson.  With me is David Conrad from

16   my Dallas office.  We are here this morning in the 111 case on

17   behalf of Amazon, IAC Search, Brain Busters, Shoebuy, Kayak

18   Software, Netflix, the Orbitz companies.

19              And then in the 112 case, we represent Flareview

20   Travel and Flightbookers.

21              In the 275 case we represent Barnes & Noble, Brawn,

22   Cabela's, Continental Airlines, Delta Airlines, Google,

23   Iconix/IP Holdings, Musicians Friend, Onestop, Tiffany &

24   Company, TripAdvisor, U.S. Airways, Target Corporation, and

25   Zappos Retail.
```

1              Your Honor, I note in the 275 case two of our

2     defendants, Borders Group and Oriental Trading, have been

3     severed off because of a bankruptcy issue.

4              In the 491 case we represent Andersen Windows,

5     ASICS, Chico's, Citizen Watch, Dillard's, Goodyear, Jones

6     Retail, Macy's/Bloomingdales, Mitsubishi Motors North America,

7     Subaru, Sunglass Hut, Wolverine, and Women's Apparel Group.

8              MR. HEARTFIELD:  Good morning, Your Honor, Thad

9     Heartfield.  I'm here on three of the cases.  In the 111 I

10    represent Disney Online and Time and Maghound with Johnson &

11    Steptoe.  Also in the 111 case with John Bisbikis, I represent

12    Sears and Kmart, JC Penney, Office Depot, and Gap.

13             Also, with Mr. Bisbikis in both of the other two

14    cases, 275, we represent Patagonia, Nordstroms, REI, QVC,

15    Juicy Couture, Liz Claiborne, Williams Sonoma.

16             And in the 491 case, we are here for Kohl's and New

17    Balance.

18             THE COURT:  Thank you.

19             MR. WILCOX:  Melvin Wilcox along with Mr. Ray

20    Churchill in the 275 case.  We only represent Sony.

21             THE COURT:  Thank you.

22             MR. PATTERSON:  Good morning, Judge, I'm Jeff

23    Patterson in the 491 case.  Jeff Cox and I represent the

24    Nissan Defendants.

25             MR. SORDEN:  Your Honor, Gary Sorden for Southwest

1    Airlines in the 275 case.

2            MR. HALLAJ:  Ibrahim Hallaj.  I represent American

3    Eagle Outfitters, Inc., and AEO Management Co. in the 275

4    case.

5            MR. PHILBIN:  Your Honor, Phillip Philbin of Haynes

6    & Boone in the 275 case for Lowe's Home Centers.

7            MR. HAWES:  Your Honor, Eric Hawes from Morgan

8    Lewis.  I represent Adidas, Aeropostale, American Girl,

9    Mattel, Nautica, and Ralph Lauren.  They are all in the 491

10   case.

11           MR. DAVIDSON:  Dan Davidson, Your Honor, from

12   Fulbright & Jaworski in the 111 case.  We represent Yahoo!.

13           MS. RACE:  Deborah Race in the 275 case and Brooks

14   Beard and we represent Restoration Hardware.

15           MR. CORNELIUS:  Your Honor, Bill Cornelius and Brian

16   Tollefson for LG Electronics USA in the 491, and with Peter

17   Brann for Hasbro and Jill in the 491 case.  And for Coldwater

18   Creek in the 275 case.

19           MR. FISCHMAN:  Your Honor, Gary Fischman in the 491

20   case for Brunswick, Procter & Gamble, Gillette,

21   Harley-Davidson, and -- let me make sure I have them all.  I

22   believe that's it.  Thank you, Your Honor.

23           MR. RICE:  Your Honor, Ed Rice of Loeb & Loeb for GM

24   in the 491 case.

25           MR. CRAFT:  Your Honor, Brian Craft and Floyd Nation

1    here.  We represent AOL and MapQuest in the 275 case.

2           MR. FINDLAY:  Good morning, Your Honor, Eric Findlay

3    representing Motorola and Navistar in the 491 case.  With me

4    for Navistar is Craig Leavell.  And with me for Motorola is

5    Jonathan Sobel.  Thank you.

6           MR. CONLEY:  Your Honor, Gerald Conley of Andrews &

7    Kurth for Staples in the 275.

8           MR. ALSOLAM:  Ramsey Alsolam from Perkins Coie for

9    Redbox Automated in the 275 case.

10          MR. SOBEL:  Jonathan Sobel, Your Honor, representing

11   Motorola.

12          MR. DACUS:  Good morning, Judge.  Deron Dacus here

13   with Whitney Winston on behalf of Toyota.  Also here on behalf

14   of Volkswagen with John Sweeney, Steve Meyer, and Sergey

15   Kolmykov.  And also on behalf of Bentley.  In addition here on

16   behalf of AT&T, with Chad Ennis, Your Honor.

17          MR. JOHNSON:  Good morning, Your Honor.  Jeffrey

18   Johnson.  I'm here with Lead Counsel Robert Fuhrer on behalf

19   of Bass Pro.

20          MS. MILLER:  Good morning, Your Honor, Laura Miller

21   on behalf of Herman Miller, Inc., in the 491 case.

22          MR. WINSTON:  Good morning, Your Honor.  In addition

23   to representing Toyota -- my name is Whitney Winston -- I am

24   also representing Disney Online; ESPN Enterprises; American

25   Broadcasting Companies; Time, Inc.; and Maghound Enterprises

1    in the 111 case.

2          MR. CROWE:  Good morning, Your Honor, Dan Crowe with

3    Bryan Cave in the 275 case.  I represent Neiman Marcus.

4          In the 491 case I represent Bergdorf Goodman.

5          MR. FAULKNER:  Good morning, Your Honor, Rick

6    Faulkner.  In the 491 case, I, along with Emmett McMahon of

7    Robins Kaplan, represent BBY Solutions, Inc., and BestBuy.com.

8          MR. STEVENS:  Good morning, Your Honor, Scott

9    Stevens here for VF Outdoors in the 275 case.

10         MR. THAMES:  Good morning, Your Honor, Glenn Thames

11   for HSN in the 491 case.

12         MR. ENNIS:  Good morning, Your Honor, Chad Ennis for

13   ATInc. in the 491 case.

14         MR. LOVE:  Good morning, Your Honor, Greg Love and

15   Jim Sulentic in the 491 case for Hayneedle, Inc.

16         MR. VEON:  Good morning, Your Honor, Robert Veon and

17   William Oldalch, and we represent Abercrombie & Fitch in the

18   111 case.

19         MR. RENK:  Good morning, Your Honor, Chris Renk.

20   And with me is Michael Harris.  We represent Nike in the 111

21   case.

22         MR. GILLAM:  Gil Gillam and Nathan Johnson, Your

23   Honor, in the 111 case representing Russell Brands.

24         MR. CARTER:  Leon Carter --

25         MR. GILLAM:  I'm sorry.  I apologize, it is the 491

 1    case.

 2              MR. CARTER:  Leon Carter of Munck Carter in the 111

 3    representing Chase -- JP Morgan Chase Bank.

 4              MR. AINSWORTH:  Charles Ainsworth and John Ward for

 5    Victoria's Secret in the 491 case.

 6              MS. HARGROVE:  Good morning, Your Honor, Lindsey

 7    Hargrove of McGuire Woods for Ford Motor Company in the 111

 8    case.

 9              MR. RICHARDSON:  Good morning, Your Honor, Michael

10    Richardson and Bob Cultice here in the 491 case for the Kodak

11    defendants.

12              THE COURT:  Okay.  Is that everybody?

13              All right.  Let me inquire before we go any further

14    just -- is there -- have the defendants met, and is there

15    anyone that is speaking on behalf of all or certain groups of

16    the defendants?

17              MR. JONES:  Your Honor, we have certainly met.  And

18    we have talked about the issues we thought would come here

19    today.  On most of those issues I think I am the person that

20    is prepared to speak with limited authority.  When I say

21    something they don't agree with, they can jump up and tell

22    you.

23              Then with regard to the various issues like the

24    motion to bifurcate, I think Mr. Peter Brann is going to

25    address that.  So it depends upon the issue, Your Honor.  We

1    have met and tried to gain ideas that we have collectively so

2    everyone does not have to speak.  If that answer the Court's

3    question.

4              THE COURT:  Let me inquire, Mr. Jones, are there

5    joint defense group agreements among all of the defendants or

6    among various groups of defendants?  Can you give me any

7    insight into that.

8              MR. JONES:  There is a joint defense group

9    agreement.  I guess it -- in open court I am very reluctant to

10   know what I can say about that, Your Honor.

11             THE COURT:  Okay.

12             MR. JONES:  Your Honor, I don't know that I can go

13   any further to respond to the Court's question.

14             THE COURT:  All right.

15             MR. JONES:  Now --

16             THE COURT:  Have you -- whatever joint defense

17   groups there are, is plaintiff aware of those or not at this

18   point?

19             MR. JONES:  I do not believe so, Your Honor; not to

20   my knowledge.  And if the Court needs more information about

21   that, it would seem to me in camera there ought to be a way to

22   do that.  I'm not trying to be reluctant.

23             THE COURT:  I appreciate your discretion in that

24   regard.

25             MR. JONES:  Thank you, sir.

1          THE COURT:  Okay.  What I want to do this morning,

2    and I am prepared to take whatever time is necessary today,

3    and I appreciate Lead Counsel being here, I want to have a

4    meaningful discussion about this case, about what plaintiff is

5    about and hopes to accomplish, what defendants are about, what

6    they hope to accomplish, and really discuss any and all ideas

7    to more effectively manage this case.

8          I think this case sets somewhat of a record, at

9    least in my court, as far as the number of defendants named.

10   As you can tell by the announcements and the attorneys here, I

11   think at last count there were 124 defendants that have been

12   sued.

13         And I will just say quite candidly at first blush

14   the defense costs to that many defendants all going forward at

15   one time causes the Court some concern.  And I would like to

16   explore ways of trying to minimize that cost and at the same

17   time accomplish the objectives of the plaintiff and whatever

18   their objectives are in bringing the case in the manner they

19   have and the defendants as far as what their objectives are in

20   effectively defending their clients, getting the resolution

21   that they want, settling the case, or defending the case.

22         So with that, I think I would like to just start --

23   and I take it both sides have given some thought as to what

24   they think.  I have received your briefing.  And I would like

25   to just hear from the plaintiff first, and I will let you make

1   whatever presentation you would like.  And then I will hear

2   from any of the defendants, and then we will have some

3   discussion.

4           MR. BOSY:  Thank you, Your Honor.  George Bosy for

5   Parallel Networks.

6           I would like to address the issue of bifurcation,

7   the issue of our strategy and desires here, the efficiency

8   issues that we see as possibilities, and how to conduct

9   Markman in a way that would be concise and also efficient.

10  Those are the issues that the Court asked us to look at, and

11  we have looked at and we have some ideas here.

12          THE COURT:  Okay.

13          MR. BOSY:  First of all, left me just briefly

14  explain what the invention is.  And one way to do that is by

15  way of example.  And the example that I have is if one wanted

16  to use, say, a personal computer to access a retail website

17  to, say, buy shirts.

18          Before the invention, the way that worked was as

19  follows:  You would access the website, you would find out the

20  shirts that were on offer, you would transmit then your

21  further desires -- say you wanted white shirts -- and then you

22  might transfer further requests -- size of the shirts,

23  quantity of the shirts, price of the shirts.  This is before

24  the invention.

25          What I have just described is a very complicated

1    process.  The server at the website had to process all those

2    requests.  There were numerous transmissions between the

3    personal computer and the website.  And the personal computer

4    was heavily taxed by all of this, too.

5              THE COURT:  The personal computer was what?

6              MR. BOSY:  Heavily taxed.

7              THE COURT:  Okay.

8              MR. BOSY:  That worked for a while.  And then the

9    Internet exploded.  The number of requests that were going to

10   websites grew dramatically.  And what that caused was very

11   excess taxing of the servers, communications that were not

12   going very fast, and also the personal computer couldn't deal

13   with it all.  What that means is it took you a long time to

14   get what you want.

15             Then comes our invention.  Under our invention all

16   of that is made more efficient.  Because what happens is when

17   you use your personal computer to go to the website, in

18   general, the website gets the information you want and adds

19   with it an applet that allows your personal computer to

20   process this request without going back to the server.  So as

21   an example --

22             THE COURT:  It sort of downloads a mini version of

23   what would be happening at the server?

24             MR. BOSY:  Exactly right.  So the server would then

25   send you -- a person doing this -- an applet.  That is a small

1   computer program.  And it would send you all of the

2   information.  Then you on your personal computer could do all

3   of the manipulation of the data that you needed.  You wouldn't

4   have to go back to the server.  You could select shirts by

5   color.  You could select shirts by size.  You could select

6   shirts by cost.

7          So that is the essence of the invention.  It

8   basically speeds everything up.  It takes the load off the

9   server.  It results in fewer communications, and it makes the

10  work of your personal computer much quicker and more

11  efficient.

12         And so because this invention is pioneering of its

13  nature, that is why we see so many people using it.  That is

14  the explanation.  The key thing about website access is speed.

15  And if you don't have speed, you don't have anything.

16         So that, in our view, is why so many entities are

17  using this technology.

18         With that, let me turn to the issue of bifurcation.

19         THE COURT:  Well, before you leave that, let me --

20  give me a little more background on the invention, the

21  inventor, the date of the application, the patent, and sort of

22  where that fits in the timeline of what is going on in the

23  industry.

24         MR. BOSY:  Okay.  Sure.  The patent application was

25  filed in the summer of 1999, and it is based on an actual

1    reduction to practice a year before.  The inventor -- there

2    was just one -- his name is Keith Lowery.  He now resides in

3    Seattle.  He will be moving back to Texas, and we would expect

4    to call him as a witness at trial.

5            The work was done by a predecessor-in-interest to

6    Parallel Networks using their own funds and their own research

7    and development activities.  In other words, these were not

8    patents we went out and bought.  This is our work.  So --

9            THE COURT:  Did Mr. Lowery work for Parallel or

10   assign it to Parallel?

11           MR. BOSY:  He did.  He worked for a

12   predecessor-in-interest of Parallel Networks and he assigned

13   all right, title, and interest of the patent to Parallel

14   Networks.

15           THE COURT:  Who was the predecessor?

16           MR. BOSY:  The predecessor was epicRealm.

17           THE COURT:  When did the patent issue?

18           MR. BOSY:  It issued in 2002.

19           THE COURT:  Okay.  And since 2002 what has been

20   going on with either Parallel or the predecessor over the last

21   eight years?

22           MR. BOSY:  Since then the predecessor went through a

23   number of reorganizations, financial issues there.  Parallel

24   has been involved in other patent litigation not related to

25   this patent.  And that is about it.  So, you know, we bring

 1   ourselves up to this date.

 2        THE COURT:  Okay.  All right.  Then tell me, if you

 3   know, from -- and you may want to defer to defendants just

 4   with regard to what their position is, I mean is this

 5   primarily -- or from your perspective what are going to be the

 6   key issues?  Are we talking about it is going to turn on the

 7   constructions, Markman constructions?  Are there

 8   indefiniteness issues being raised?  Is there prior art that

 9   is being alleged against it?  Kind of address --

10        MR. BOSY:  Let me tell you what I know.

11        THE COURT:  Okay.

12        MR. BOSY:  We have had a lot of conversations with

13   the defendants on various subjects, on trying to get a

14   scheduling order before the Court.

15        THE COURT:  First of all, I applaud you for even

16   getting a scheduling order before the Court with this many

17   defendants.

18        MR. BOSY:  It was a lot of work.

19        THE COURT:  That is no small task.

20        MR. BOSY:  There was a lot of back and forth there.

21   And, you know, we have just got a few little unsettled issues,

22   but by and large they are ready to go.

23        For the most part what I am hearing is not

24   infringement defenses.  I mean, that is what I am hearing.

25   And they seem to us to be based upon a Markman construction

1    that we wouldn't agree with it.  That is the -- that is what I

2    am understanding.  I mean, I have heard that many, many times.

3                THE COURT:  That noninfringement argument goes to

4    what feature?

5                MR. BOSY:  There are several that we have heard.  As

6    I said, the patent requires an applet.  It requires that the

7    server send an applet to the personal computer.  And many of

8    them are saying that they don't have applets, they don't use

9    that.

10                It seems to us that in saying that, they are

11    misconstruing what an applet is, I mean, in a nutshell.  That

12    is what our position is.  So almost certainly one term that

13    the Court is going to have to construe is an applet.

14                There is a requirement in the patent, as I said,

15    that an applet be sent back to the personal computer and that

16    also data must be sent back.  In the example that I gave, the

17    data would be the shirts; their colors, their sizes, and so

18    forth.

19                Many defendants are saying that they don't do that,

20    they don't perform that step.  Again, it is our view that in

21    saying that, they have misconstrued the claims.  So we call it

22    the constituent system.  That's what we call it.  I really

23    have no doubt that that will be another key point in the

24    Markman hearings.

25                There are other noninfringement arguments, but those

1    are the ones that I hear repeatedly.

2            THE COURT:  Okay.

3            MR. BOSY:  Okay.  I haven't heard many invalidity

4    arguments.  There have been a few.  We have looked at them,

5    and we just think they don't have any merit.  This is what we

6    have.  We have invalidity contentions from the defendants in

7    111.  We don't have them yet from 112, 275, or 491.  They

8    would come in later.

9            I believe the 111 defendants have presently relied

10   on 78 prior art references.  We have gone through them.  Many

11   of them can be discarded as just being completely irrelevant

12   and not even related to the technology.  We have narrowed them

13   down to the ones that may be related, and we just don't see

14   every element of the invention in any of those references.

15           And also the references that we have looked at and

16   focused on, seem to teach away the obviousness issue.  In

17   other words, the technology in these references is not

18   directed to improving efficiency in accessing a website, so we

19   don't see that there is a good -- you know, obviousness

20   argument there.

21           But, again, we haven't heard much on that.  So to

22   our minds the issues that we have heard are infringement.

23   Markman would be very important for that.  Perhaps,

24   invalidity.  We haven't talked much about damages.  We have

25   been awaiting the Court's ruling on bifurcation.

1         But it would be -- and I will get to this in a

2    minute.  It would be our view that we are looking at a

3    reasonable royalty, and it would be, of course, based upon the

4    Georgia-Pacific factors, an analysis of those.  And once the

5    reasonable royalty would be established, it would be

6    multiplied against the revenue generated from the website.

7         So if a clothing retailer generates a certain amount

8    of revenue from that website, that is an example, then it

9    would be our view that the damages would be whatever the

10   reasonable royalty rate is times the volume of goods sold on

11   the website.

12        THE COURT:  What about the entire market value rule

13   and how that would relate?

14        MR. BOSY:  The way I think about it is the entire

15   market value rule probably wouldn't apply here.  The reason

16   is, is the infringing activity is the operation of the

17   website.  I mean, this patent doesn't cover clothes or cars or

18   anything like that.  It simply facilitates the accessing of

19   the website.

20        So in that sense it probably doesn't make any

21   difference whether they are selling cars or clothes or airline

22   tickets.  It just doesn't matter because they are all doing

23   this for the identical reason; it is faster, and it is more

24   efficient.

25        So in my conception the reasonable royalty analysis

1    would be based upon looking at the advantages that are gotten

2    from the use of this technology at the website.  And the

3    advantages would come out with a number going through all of

4    the factors; and then as I said, that number would apply to

5    whatever sales they are getting.  Whether it is cars or

6    whether it is airline tickets, it just wouldn't make any

7    difference.

8            So in that sense -- and I will get to this a little

9    bit later too -- the damage analysis is fairly

10   straightforward.  I mean, in other words, it isn't a damages

11   analysis that really requires a very, very detailed look into

12   every single defendant here.  And the reason for that is they

13   are all doing this for exactly the same reason; faster, more

14   efficient access to the website.

15           So that is how I understand the issues now, based

16   upon what I have been told in telephone conversations and in

17   filings with the Court.  For example, Bentley filed a paper

18   with the Court; and what they talked about is

19   noninfringement.  Yahoo! filed a paper with the Court.  They

20   too only talked about noninfringement.  So that is why I am

21   coming to the conclusion that I have.

22           THE COURT:  Okay.  All right.

23           Okay.  Why did you elect to bring the case in this

24   manner of suing so many defendants versus picking a few target

25   defendants and suing them to sort of test the validity of your

 1   patent and your case and establish a damage and then try to

 2   license the other defendants?

 3          MR. BOSY:  Yes, I can explain that.  It is because

 4   perhaps of our strategy here.  Due to the fact that there are

 5   so many entities infringing this patent, it was our conception

 6   that attempting to try every single one of them sequentially,

 7   did make sense from a cost viewpoint, and it doesn't make

 8   sense from the viewpoint of what our demands have been.

 9          From our idea, our demands have been very reasonable

10   and they have been based upon a fraction, a small fraction of

11   what we believe we could acquire in a reasonable royalty

12   analysis, damage analysis.  We believe that the demands also

13   are of interest or should be of interest to the defendant

14   because we have structured it so that we believe that it would

15   be substantially less than what they would need to spend to

16   bring this case to trial, to Markman.

17          So, you know, it was our strategy not to go after

18   one defendant and ask for $30 million.  It was our strategy to

19   go after a lot of defendants, get those issues resolved,

20   hopefully, by settlement.  So that has been our strategy.

21          THE COURT:  What's -- when you say that in your

22   settlement strategy you have been -- sort of what is your

23   damage model or settlement model that you are operating under

24   as you extend these offers?

25          MR. BOSY:  Yes.  I mean at present, you know, we

1    would be looking at not less than a reasonable royalty in the

2    neighborhood of two to three percent.  I don't want to be

3    bound by that, but it would be as low in our mind as it would

4    go.

5             THE COURT:  Let me stop you right there.  I want to

6    have a really frank discussion today, and I know that from the

7    plaintiff's standpoint just as you just said, I wouldn't want

8    to be bound to that.

9             MR. BOSY:  Right.

10            THE COURT:  You have not completed your analysis,

11   you want to leave your options open.  And I think from the

12   defendants' standpoint there are lots of things you might be

13   hesitant to say, you know, that, well, will this bind me

14   later.  So I was thinking before the hearing -- and I would

15   just like to get everyone's idea on this, at some point in the

16   hearing maybe just going off record with our discussion, if

17   there was no objection to that, and we could even do that at

18   this point or do it later.  I'm really thinking of later.

19            But if there is something that I bring up that you

20   would rather not comment on and say could we do that off the

21   record.  But before we go there, let me just ask if I elect to

22   do that at some point during the hearing -- I am welcome to

23   opposition to it if someone has a reason why they would not

24   think that would be a good idea at some point to facilitate

25   discussion -- is there anybody that would have an objection to

1    that if I decide to?  Please feel free to speak up if you do.

2            MR. JONES:  I don't think the defendants would, Your

3    Honor.  And I am kind of in a little bit of a box because

4    obviously I represent five defendants.  I'm speaking for more.

5    If the Court would understand when I speak, I'm giving you my

6    impressions --

7            THE COURT:  I understand.

8            MR. JONES:  -- as to where I think the defendants

9    are, and I am not trying to bind them.  I don't think the

10   defendants would have a problem with that, Your Honor.

11           THE COURT:  Either that, if y'all would just rather

12   have an agreement that anything said here by the other parties

13   is not going to be quoted back to them in a trial or with

14   regard to a witness, would that be helpful?

15           MR. JONES:  Subject to my brethren standing up and

16   saying they object to that, I have no problem with that.

17           THE COURT:  All right.  What about

18   plaintiff?

19           MR. BOSY:  We have no problem with that.

20           THE COURT:  Anybody have any problem with that?

21   Objection to it?  Speak now.

22           MR. HALLAJ:  Your Honor, the comments the plaintiff

23   made about the distinction between their invention and the

24   prior art might be helpful; and so if you are referring to

25   future comments --

1        THE COURT:  I'm sorry, I couldn't hear you.

2        MR. HALLAJ:  The comments that were made a few

3   minutes ago about how the prior art worked and the difference

4   between the prior art and the invention that the plaintiff is

5   bringing, those are very helpful.  And so it would, perhaps,

6   be appreciated to be able to refer to those in papers later if

7   there is an issue that comes up later.

8        THE COURT:  You mean, like in court to say well

9   plaintiff said at this hearing that this is the distinction

10  they make on prior art?

11       MR. HALLAJ:  Yeah, if some of those distinctions

12  between the invention and as described between the prior

13  art --

14       THE COURT:  See, that's what I am trying to avoid --

15  go ahead.  Stay up.  I'm not asking you to sit down.  What is

16  your name?

17       MR. HALLAJ:  My name is Ibrahim Hallaj.

18       THE COURT:  Okay.  I just needed that for the

19  record.

20       But that is what I am trying to avoid where he

21  doesn't have to be -- where he can speak a little more

22  candidly without being worried about somebody is going to get

23  this transcript and put his expert on the stand and say now

24  didn't you say on this date that -- your own attorney said

25  this.  So that is what I am trying to avoid.  Are you saying

 1   you would like to use that in a trial later?

 2           MR. HALLAJ:  I think -- I'm not insisting on it, but

 3   I am saying some of these things are informative because my

 4   client is trying to understand what the basis is --

 5           THE COURT:  Well, I think you are free to repeat to

 6   your client anything that is said at the hearing.  I'm not

 7   saying this hearing should be closed; but I am just saying as

 8   far as using it in any of your litigation going forward, can

 9   we have that agreement that it will not be used there?

10           MR. HALLAJ:  I think we are willing to do that.

11           THE COURT:  Okay.  Anybody else have an objection?

12           Okay.  As far as that goes at this hearing feel free

13   to speak.  It is not binding on you.  It is not going to be

14   read back to you in a trial or in a Markman hearing, well, he

15   took this position with regard to prior art or the defendants

16   took this position with regard to their constructions.  I want

17   everybody to feel free to talk.

18           So go ahead.

19           MR. BOSY:  Okay.  Let me just talk a little bit

20   about bifurcation, the history here.  The way this started

21   was --

22           THE COURT:  Well, before you go to bifurcation, we

23   were talking about your damage model and reasonable royalty,

24   and you were saying three percent.  I would like to drill a

25   little deeper.  I notice that you have settled with half a

 1   dozen defendants.

 2           Do you have a model that -- I'm not asking -- if you

 3   have not divulged it to these other defendants, you don't need

 4   to say right now.  But do you have a model that you are using

 5   when you talk to defendants, well, based on your sales, you

 6   know, here is the lens through which we are viewing what we

 7   would be willing to settle with you for as this point, and it

 8   is related to sales?  Or is it more related to cost of

 9   defense?

10           MR. BOSY:  It is related to both.

11           THE COURT:  Okay.

12           MR. BOSY:  So where we start is that if we go to

13   trial and win, we are going to get a reasonable royalty.  Let

14   us say it is not below two to three percent.  And if you

15   multiply that by the royalty base, which would be the sales on

16   that website, whatever way you look at that, the number is

17   going to be much higher than our demand.  I mean, it is just

18   way, way less than that number.

19           So if you want to take this to trial, that is your

20   exposure, and you need to evaluate, you know, what risk there

21   is.  But we are discounting the demand in such a way to make

22   settlement very attractive to you.  I mean, that is the way

23   our thinking has been.

24           There are some defendants who say, well, we don't

25   sell anything on the website, so there isn't going to be

1   damages.  That would be, say, a car maker.  You know, they

2   don't sell cars on the websites.  But what they do do is offer

3   their websites to potential car buyers.  And if they are

4   interested, then they download all of the information; the car

5   they want, the wheels, how much they want to spend.  And then

6   they take it to a dealer.  So that is how they are selling

7   through that website.

8           Your Honor had a case on that.  It was, I believe,

9   Hyundai -- it was a Hyundai case.  And that case showed, for

10  example, that car makers in this particular case absolutely

11  have to have this website; and that they have internal

12  calculations which show what their conversion rate is, meaning

13  the people who go to the website how many actually go to

14  dealers and buy cars.

15          So I would expect that all these entities here that

16  do not sell anything directly on that website have a good

17  understanding of what they are getting out of it.  So for

18  those we have said we don't have any damages because we don't

19  sell anything on our website, that has been my answer.  You do

20  sell things through your website.

21          THE COURT:  When you say you discount your demand,

22  can you give me a range -- let's say if you were willing to

23  settle a case for in the 250 to $500,000 range, what kind of

24  damage model would you be looking at, from what to what?

25  Would that apply to somebody with a potential through the lens

1   through which you view it would have a $5 million exposure or

2   a $50 million exposure or $200 million exposure?

3   MR. BOSY:  The exposures vary entity by entity.  Some, for

4   example, Amazon, are very, very big; hundreds of millions of

5   dollars are sold on their websites every year.

6           THE COURT:  And you haven't settled with Amazon yet?

7           MR. BOSY:  No, we haven't.

8           Some are less and would have probably a lesser

9   exposure; and the one that, for example, I have in mind is JP

10  Morgan.  We know what they do and how it works.  And so

11  because that exposure is smaller, we would have a range of

12  settlement numbers, which Your Honor knows what they are.

13  And, you know, they probably would be toward the bottom of

14  that range.  Whereas, Amazon would be near the top of the

15  range.

16          We have also listened to -- we have listened to

17  everything they have told us, including all of the factors

18  that they think are relevant, including their noninfringement

19  arguments.  But the noninfringement arguments -- and we looked

20  at them, and they really boiled down to pretty much the same

21  thing I told you.  They don't use applets.  The don't transmit

22  data back to the personal computer.  And some of them say when

23  that information is transferred to the personal computer, you

24  can't really operate on the data.  That is kind of in a

25  nutshell what we have heard.

1          Again, we think and we have explained that those
2     noninfringement arguments are based upon a misreading of the
3     claim terms that would be construed in a Markman hearing.  So
4     that, in sum, is what we have been doing.  And we had a lot of
5     settlement discussions.  Your Honor knows that we have seven
6     now; and there are, right at this point in time, quite a few
7     in the works that we are working on.  We think we are pretty
8     close to settling, you know, at least another handful of cases
9     pretty quickly.
10          We have, in general, had a pretty easy time --
11     mostly -- deciding on a number.  The difficulty has been
12     frequently these defendants have different commercial issues
13     with regard to, you know, the license agreement.  And so we
14     have spent a lot of time altering our standard license
15     agreement to suit the needs, you know, of a defendant.
16          I mean so, for example, you know, an auto maker
17     might want to, you know, be clear that when we enter into this
18     license agreement that, you know, all of these automobiles
19     will -- you know, cannot be charged with infringement,
20     notwithstanding the fact that, you know, automobiles today
21     might actually have personal computers in them to go to a
22     website to get information.
23          So when that request has been made we have inserted
24     appropriate language to satisfy them; and, you know, that is
25     what we have been doing.

```
 1              THE COURT:  Of the 124 defendants so far you have
 2   settled with --
 3              MR. BOSY:  Seven.
 4              THE COURT:  Seven.  And how many additional ones do
 5   you have extending offers out to?
 6              MR. BOSY:  Well, I don't have an exact number.  Some
 7   of the offers have expired, but --
 8              THE COURT:  Or have you made offers to?  I will put
 9   it that way.
10              MR. BOSY:  Well, over half, well over half.
11              Let me put it this way:  Our communication line has
12   been open.  We have written to every defendant and told them
13   that, you know, if you are interested, we would like to talk.
14   We have talked to about half of them, and I suppose it is our
15   impression that because we never heard back from them, the
16   other half don't want to talk right at this moment.  They may
17   be waiting for the results of further proceedings in this case
18   as we go along.
19              In three of the cases nobody has produced documents,
20   and in none of the cases has anybody had to identify claim
21   terms that need to be construed.  So according to the
22   schedule, there is a lot of things going on here; and it may
23   be the defendant wants to wait and see what happens at the
24   next step.
25              THE COURT:  Are the various defendants aware of what
```

1   other defendants have been offered, or is that all

2   confidential?

3        THE COURT:  They don't know what has been offered.

4   But -- let me back up.  They certainly know about the seven

5   agreements.  We have produced them.  So they know that.  And

6   it is my impression that they know pretty well that that is

7   the range, give or take a little bit, that we would take.  And

8   every time we have ever talked to them we have conveyed that.

9        THE COURT:  What is that range?

10       MR. BOSY:  That range is about $200,000 to around

11  $500,000.

12       THE COURT:  Okay.  All right.  And based on that

13  range of what you would be willing to settle with the

14  defendants on, what type of damage model range from a low to a

15  high do you have?

16       MR. BOSY:  A high would be around $20 million a

17  year, and a low would be something that we are not sure of

18  because we don't have sales information.  Some entities we

19  have very clearly disclosed sales information, and some

20  entities we don't.

21       THE COURT:  The ones you have sales information,

22  what would be your low?

23       MR. BOSY:  Some of them go down pretty low, maybe

24  $10 million a year.  That would be about $200,000 a year.

25       THE COURT:  Okay.  And on someone that has a

1   $200,000 a year damage model, are they still in that 200 to

2   500 range as far as settlement?

3            MR. BOSY:  Yes.

4            THE COURT:  All right.  Let's go ahead with, I

5   guess, bifurcation.

6            MR. BOSY:  Okay.  Let me just touch on the history

7   here.

8            THE COURT:  Well, I tell you what, before we get to

9   bifurcation, let me -- do you have anything else generally

10  about the case, how we got here, what you would like to see

11  happen as far as the case; in other words, what the plaintiff

12  is trying to accomplish by this litigation?  I guess you have

13  answered that as to you believe your patent is very

14  widespread, affects a lot of people, and you are willing to

15  discount their potential damage in order to settle the case?

16           MR. BOSY:  That's right.  And so our goal is

17  twofold.  First, to try to settle as many defendants out under

18  the terms that I have talked about that.  That is our

19  strategy.  And for those that don't wish to settle out, we

20  want to adhere to the Court's schedule; Markman in October and

21  trial the following year.  And no matter whether damages is

22  bifurcated or not, we want to adhere to those schedules.  We

23  want to get this case resolved for whoever is left in it.

24  That is our goal.

25           THE COURT:  Very good.  Let me hear from defendants

 1   now.  Thank you.  I really appreciate your candid

 2   explanation.

 3            Mr. Jones.

 4            MR. JONES:  Thank you, Your Honor.  Let me try to

 5   address the same questions you just asked the plaintiff, on

 6   behalf of the defendants.  And let me try to be also as candid

 7   and frank as possible; and, like I say, to my brethren when I

 8   say wrong things, just make sure the Court knows that.

 9            The first thing I would tell you, you kind of asked

10   the plaintiff what do they really want out of this litigation.

11   On behalf of the defendants collectively, I can tell you what

12   they want out of this litigation.

13            The defendants that are left, when I hear them talk,

14   what I hear is they think they do not infringe these patents;

15   and they desperately want a way cost effectively to be able to

16   defend themselves from suits like this without being forced to

17   a settlement based upon cost of defense.

18            Now, Your Honor knows -- while we are being frank

19   here -- that there are a lot of suits going on today about

20   patents that you need to be able to carry on electronic

21   commerce.  There are a lot of patents out there claiming the

22   same things that Mr. Rosen (sic) just claimed.  And these

23   defendants are seeking a way that they can resist those

24   patents that they legitimately do not infringe and do so in

25   cost-effective manner because if they have to settle all of

1    those cases based on cost of defense, it does add up and it

2    does affect the cost of doing business in a very, very real

3    way.  So that is the goal.

4            Now, how do we get to that goal?  How do we

5    accomplish that goal?   The second thing I see that I will

6    again kind of dive off Mr. Rosen's (sic) comments is I do see

7    some agreement in this case when you do an analysis of it.  He

8    says that when he talks to the defendants, he says mainly what

9    I see here is an infringement argument.

10           Well, that goes up to my point number one, he is

11   hearing it right.  He is hearing I guess the same thing I am

12   hearing, Your Honor.  He is hearing that these defendants

13   collectively believe they don't infringe the patent.

14           And, in fact -- and that is what -- in preparing for

15   this hearing today, what the defendants have tried to do is

16   they have tried to come to the Court and decide what can we

17   talk to the Court about collectively?  What can we deal with

18   in a macro sense because it applies to all of us and let's try

19   to do that first and narrow the issues in this case and then

20   hold off those things that are specific to various defendants

21   that we have to deal with in a noneficient fashion.

22           So when we looked at it and when we tried to come up

23   with what can we deal with collectively, it is this issue of

24   noninfringement that we agree with the plaintiffs kind of

25   overrides all of the defendants in this case.

```
 1                Now, Your Honor asked me when we first started,

 2     about the joint defense group.  I'm not going to presume that

 3     I can read your mind.  But what I assume you were interested

 4     in because I have been in other cases in your court where the

 5     defendants, we can kind of break them out into groups; we had

 6     suppliers or we had manufacturers, we had shipmakers, you

 7     know, we had various different things, and can there be

 8     groupings like this.

 9                Your Honor, I don't believe this case is one of

10     those cases where we break down into groups like that.  It

11     doesn't seem to work that way.  We have done an analysis to

12     see, you know, looking at the infringement contentions, how do

13     we group the defendants?  And what we have found, I believe,

14     is that is not very helpful in this particular case.

15                Now, if you want to go into the details of the

16     analysis, I am going to punt to Mr. Gary Sorden.  Thompson

17     Knight has done this work.  But what they have found is

18     basically there are only two different categories.  Some of

19     our systems are based upon JavaScript.

20                THE COURT:  Based on what?

21                MR. JONES:  JavaScript.

22                THE COURT:  Okay.

23                MR. JONES:  That is about 98 percent of the systems.

24     That's why it doesn't give us very much help.  The others are

25     Flash systems.  And you know my technical deficiency, so I
```

1   will punt to him if we have got to go any further in that.

2          THE COURT:  That's far enough.

3          MR. JONES:  But what we see there is that doesn't

4   help us a lot.  But what we do find when we look at things

5   collectively, is that there are two, maybe three -- I can get

6   the group committed to three, so I am going to go with three.

7   I tried to hammer them down to two, but I couldn't do it.  But

8   there are basically three infringement arguments that go

9   across the group collectively.

10          That principle also helps you, I believe, in claim

11   construction because if we don't -- again, if we stay at this

12   macro level, if we stay at the collective level, I have also

13   got agreement out of the defendants that would limit you to

14   construing three or less terms.  Again, I went for two.  I

15   have gotten them to agree to three or less.

16          So if we stay at that collective level there trying

17   to see if we can efficiently dispose of all of these

18   defendants, we can limit ourselves to three grounds of

19   noninfringement, to construing three terms by this Court.

20          And we would suggest to the Court that if you

21   continue to follow that path, the most efficient way to tee

22   this up is to allow the defendants to make a motion for

23   summary judgment on those grounds, limited to three grounds

24   and collectively as to all of the defendants; that the terms

25   that you would need to construe with regard to those three

 1    grounds of noninfringement would only be three or fewer

 2    terms.

 3             At that point -- and, again, we want to be free --

 4    we want to be fair to the plaintiffs.  It might be hard for

 5    the plaintiffs to say what discovery they are going to need

 6    until they see the motion.  So our proposal would be that we

 7    file our motion, let them see that motion, and then give them

 8    an opportunity to provide, okay, we need this in order to

 9    refute this motion certain discovery.

10             And, hopefully, we could agree upon that, that the

11    parties could agree upon that.  In good faith I believe we

12    could.  If we can, if there is something about scope that we

13    are going to get in a fight into, the Court can resolve it

14    very quickly to then allow the plaintiff to do that discovery

15    so they can respond to our motion and then present those

16    issues to the Court.

17             Now, what is going to happen?  I think generally

18    what is going to happen is the Court is either going to decide

19    that that motion is good; that the defendants' collective

20    belief was correct, we did what we were talking about and you

21    can dispose of the case efficiently.

22             If we are wrong, the plaintiff will be given the

23    opportunity to show the Court we are wrong.  But the plaintiff

24    will also probably most likely say, well, there are certain

25    fact issues here and we are going to zero in on the fact

1    issues that really count with regard to noninfringement.  And

2    at that point the Court could tailor-make a trial that just

3    dealt with the fact issues that are really important that deal

4    with the commonality of these subjects.

5           Now, that is the analysis that we have done when we

6    have tried to bring order to this process and efficiencies to

7    this process.

8           THE COURT:  Let me stop and ask you a couple of

9    questions.

10          MR. JONES:  Certainly.

11          THE COURT:  One, when you say three noninfringement

12   issues, three terms, if plaintiff loses on their -- I mean if

13   defendants lose on their motion for summary judgment of

14   noninfringement, are you going to want to come back and have

15   another Markman with more terms, or is that it?

16          MR. JONES:  That is where I don't have the agreement

17   of defendants.  I will be really open with the Court about

18   that.  I mean, the defendants have these common issues, which

19   I am suggesting the Court deal with first in this case.

20          Now, getting all of the defendants to then agree we

21   are going to give up all our specific issues, I do not have

22   that agreement.  Even on my clients I don't know if they are

23   ready to agree to that.

24          So what is the advantage?  To me the advantage of it

25   is, it is kind of like a bellwether case.  It gets us to the

1  place where people then have the knowledge they need to make

2  the decisions to either proceed with the case or make the

3  decisions to settle the case.

4          Let me go at it a different way?  I am trying to

5  come up with a proposal where the defendants aren't forced to

6  settle due to cost of defense.  But if we lose at that point

7  and we are into the category of we have got to get into the

8  specifics --

9          THE COURT:  Say that again.  I missed that.

10          MR. JONES:  I am trying to deal with the issue of

11  allowing the defendants to evaluate this case and make a

12  determination upon it not to be driven by cost of defense.  If

13  we lose the motion for summary judgment, then at that point --

14  and if we are to the point where we have to rely upon specific

15  issues, then I think cost of defense may well drive the

16  business decisions that are made.  That is the point that I

17  think the Court would be enabling or structuring the case so

18  that that does not occur before the collective issues that can

19  be handled efficiently are addressed.

20          THE COURT:  Well, I guess -- I always struggle with

21  motions for summary judgment because I think very often it is

22  an effort to, you know, get a bite at going home without

23  having anything at risk.  And I think risk is what resolves

24  cases.

25          But -- and I will also say noninfringement motions

1  for summary judgment, I don't think I have granted very many

2  of those.  And the reason is they are usually so fact

3  intensive that they are difficult, extremely difficult and I

4  am often reluctant to pour somebody out until they have had a

5  chance to really explore it and I hear the testimony in court

6  from experts and there is an opportunity to cross-examine.

7  And I may JMOL it at that point, but I have a much greater

8  level of confidence than I do just from a paper-type motion

9  for summary judgment.

10       So is this -- what you are envisioning this

11  noninfringement summary judgment, is this a discrete enough

12  issue, are each of these issues that you really think can be

13  teed up, or is it just going to devolve into a morass of

14  factual arguments and minutia that it is going to be difficult

15  for the Court to determine, and plaintiff comes in and argues

16  doctrine of equivalents and we are right back to where we

17  could have been if we hadn't even done this exercise.

18       MR. JONES:  I believe they are discrete enough, Your

19  Honor.  One of the reasons it gives me encouragement as I

20  listen to Mr. Rosen (sic) talk about applets, and we are on

21  the same page.

22       THE COURT:  What are the three issues?

23       MR. JONES:  I know two of them.

24       THE COURT:  Well, no wonder you couldn't talk them

25  into giving up the third one if you don't even know what it

1   is.

2          MR. JONES:  The problem is, Your Honor, that I

3   don't know -- since we are being open here, let's be open.  I

4   think we know two of them that everybody agrees on; and that

5   the third one is more of a back-stop because I don't know it

6   has been enuciated or agreed upon.

7          THE COURT:  What are the two?

8          MR. JONES:  I think they have been enunciated.  The

9   applet issue and also don't trans. back, back to the personal

10  computer.

11         And, Matt, if you want to help me.

12         MR. MOORE:  Your Honor, as I understand this, I

13  first want to go to the phrase that relates to an applet being

14  dynamically demonstrated in response to a request.  Part of

15  why you had two versus three is that phrase makes it a

16  portion.  And part of it is the dynamically-generated portion

17  of it.

18         The other part of it is the request.  At first it

19  was "a" request and then throughout the claim it refers to

20  "the" request, antecedent basis going back to the same

21  request.  It has to be a single request.  So those are two

22  that most of the defendants are in agreement on.

23         MR. DAVIDSON:  Dan Davidson for Yahoo!, Your Honor.

24  We had filed a pleading with the Court earlier that I think

25  set out two of issues, the single data request and executable

1    applet.  We think that given the plaintiff's preliminary

2    infringement contentions, that the Court could construe those

3    terms and we wouldn't need discovery.  Just like the Court had

4    done in the Joao Bock Transaction case.

5         Basically took the infringement contentions, there

6    was a construction, and there was no discovery.  Granted

7    that -- and the Court ruled at summary judgment.  Granted that

8    case dealt with invalidity issues and this deals with

9    infringement issues, but again --

10        THE COURT:  I will say in that case there had

11   already been a New York court where the jury had found that

12   patent invalid.

13        MR. DAVIDSON:  Correct.  But the issue there is

14   taking the plaintiff's infringement contentions here is true.

15   With certain constructions by the Court we think summary

16   judgment could be appropriate and there wouldn't even be the

17   need for discovery at that point, which is what we had set

18   forth in our brief, and I think Victoria Secret had joined in

19   as well.

20        THE COURT:  Go ahead, Mr. Jones.

21        MR. JONES:  I will be frank with Your Honor.  I

22   think the other thing we are talking about that is a little

23   unusual would be to try to identify what those common fact

24   issues are through this process.  The Court might well

25   conclude at the end of the process that, well, these are two

1    big issues here.  Other than this, it is a question of law.

2    You know, we could probably then formulate a very narrow trial

3    on those issues.

4           Now, and again being open, we have analyzed other

5    ways to do this, and this very Court has done other things.

6    One of the things we analyzed was, okay, well, is there a

7    bellwether defendant or defendants that want to go first and

8    want to raise their hands?  And get something like that done.

9           THE COURT:  Was there?

10          MR. JONES:  The answer to that question is a little

11   bit equivocal.  If the Court tells us that is what you want to

12   do, Your Honor, and you give us that guidance, I think we can

13   come up with some.  If you give us two weeks or something.  I

14   mean, there are some issues that, frankly, have to be

15   negotiated out.

16          But to be totally candid with the Court, that is my

17   answer to you.  I think there is more efficiencies with the

18   process that I suggested to you first.  But we don't have that

19   specific person named at this point in time or persons; but if

20   you told us that is what the Court prefers, I think you would

21   get there.

22          We looked at the issue of, you know, maybe if we

23   took some of these smaller cases and just got people to agree

24   to bench trials for cases less than a million dollars, that

25   that might bring efficiencies to the process.

```
 1              Again, I think you are going to find there are some

 2   defendants interested in that and some that are not, but that

 3   is another thing --

 4              THE COURT:  What, just trying it on damages or

 5   trying it on all issues?

 6              MR. JONES:  Trying it on all issues as a bench

 7   trial.

 8              THE COURT:  I don't like that idea.

 9              MR. JONES:  Your Honor, I'm trying to --

10              THE COURT:  I could see myself trying 50,

11   less-than-a-million-dollar cases for a week each, and that is

12   not appealing at all.

13              MR. JONES:  I understand.  We looked at that.

14              And there is another thing we looked at and you are

15   not going to like this one much better, so maybe I ought to

16   just shut up.

17              THE COURT:  No, go ahead.

18              MR. JONES:  We also looked at -- the Court is very

19   familiar with the ResQNet and Uniloc decisions and going,

20   okay, is there any way we can make some kind of motion to put

21   a limit on damages based upon that.  And some courts across

22   the country are doing that, but that was another idea we

23   looked at.

24              What we try to do is find out where is there

25   commonality?  Where can we get away from trying 140 different
```

1     cases because we thought the Court was trying to do that.

2          Those are the best ideas we can come up with.  It is

3     not that we haven't brainstormed.

4          Now, let me address the invalidity issue because I

5     do think at that point in time Mr. Potsy (sic) and I have a

6     little disagreement on what we are saying.  I know there is 79

7     pieces of prior art that have been cited so far.  Judge, you

8     have got over 50 great law firms here.  You know, if it is one

9     per defendant it is going to be a lot of prior art.

10          The prior art, the one thing to deal with that makes

11     it in this particular case become an individual matter, is

12     many defendants have their own prior art that they are relying

13     upon.  The Court is certainly aware that if you have your own

14     prior art, that is ten times better at trial than if you have

15     somebody else's prior art you rely upon.  So it makes

16     invalidity in this case not near have the commonality features

17     that infringement does.

18          Also, with regard to the issue of bifurcation that

19     has been brought up, let me speak for the group as a whole.

20     If you want to have the dissenting opinions, certainly we are

21     prepared to address those.

22          THE COURT:  Well, before we get to -- are you

23     talking about bifurcation of damages and liability?

24          MR. JONES:  Yes.

25          THE COURT:  I haven't given plaintiff an opportunity

 1   to speak to that.

 2              MR. JONES:  Excuse me.

 3              THE COURT:  So I will let them do that, and then I

 4   will let you respond.

 5              MR. JONES:  Thank you, Your Honor.

 6              And then finally the other issue that I wrote down

 7   that I wanted to address that he raised is Markman.  I think

 8   if we could bifurcate the Markman process to collective terms.

 9   You know, when you talk to everybody in the room, we have had

10   various conference calls and even a general meeting on this,

11   there are a whole a lot of terms that these individual

12   defendants would want to ask be construed based upon

13   individual defenses and individual prior art that people want

14   to assert.

15              Collectively, if you say, okay, collectively what

16   could we go with, we could get it down to two or three terms.

17   So that kind of deals with that issue.  I guess by way of

18   generalities, those are our comments, Your Honor.

19              THE COURT:  Okay.  Thank you.

20              Response from plaintiff?

21              MR. BOSY:  Yes.  Let me start with what I just

22   heard, and it is not really much different from what I

23   gathered from filings with the Court.

24              THE COURT:  Do you want to go to the podium.

25              MR. BOSY:  So what I am hearing here is they want to

1   file a summary judgment motion.  Some say there should be

2   discovery, some say their shouldn't.  And if they win that,

3   then obviously they have won the case.  But the problem with

4   it is, is it is piecemeal and wasteful, because what you have

5   also heard is that if they lose that, they want to go to

6   another Markman hearing while we just heard that they have

7   many new claim terms to construe.

8        And we finally heard that we haven't seen the end of

9   the prior art references, so if they lose that summary

10  judgment hearing, then we are back to Markman, we are back to

11  lots of terms on Markman.  I have a feeling that similar terms

12  are going to come in again, and then we have to go forward

13  with everything we need to do to understand what their

14  invalidity contentions are.  So that is very piecemeal and

15  wasteful.

16       Now, if they want to say we are so sure of these

17  three terms -- although actually I kind of heard five or six.

18  But if they want to say we are so sure that we will win on

19  these three terms that we are willing to go on it or lose on

20  it, no further Markman hearings, no further invalidity

21  hearings.  And if that is what they want to do, I am all

22  ears.  And if they want to file a summary judgment and if it

23  says that, then I think it is a good idea.

24       But if it says, no, if we lose we want to start the

25  process all over again; we lose our Markman hearing date; we

 1    lose our trial date because we wouldn't have been conducting

 2    discovery or doing the things we need to do.

 3              So my goal is to stick to the Markman hearing, have

 4    one; to stick to the trial; and to stick to the summary

 5    judgment proceedings.

 6              So this is what I have heard from them, and it is

 7    always kind of this vague thing like we are going to assert

 8    three claims, but then if we lose we want to start the whole

 9    thing all over again.  And, of course, we have invalidity

10    contentions, and we don't even know what the references are.

11    We know there is 79, but I think we have heard there is more

12    to come.

13              So to my feeling it is not efficient what they want

14    to do.  So if they want to file a motion that says this is it,

15    these are our defenses and there are no others, then that is a

16    good idea.  But if it is a piecemeal thing, it is not a good

17    idea.

18              The selection of a bellwether defendant, again, you

19    know I am all ears on that one.  But I do have the feeling

20    that they are going to go through their case and find the

21    defendant, the very best defendant that has the very best

22    noninfringement arguments.  And they are slightly different.

23    We are going to go through and want the bellwether to be the

24    one that has a knockout for us.  So I don't think anything is

25    going to come of that, but I am certainly happy to talk with

1    them and hear what they have to say.

2           On bifurcation, you know, we proposed this to the

3    111 defendants, and the 111 defendants all agreed it was a

4    good idea.

5           THE COURT:  Before you get to the bifurcation issue,

6    let me get a little response from Mr. Jones to what you said.

7           Mr. Jones, is Mr. Bosy correct that with regard to

8    pursuing an early Markman on a -- limited to three terms and

9    noninfringement motions based on that in conjunction with

10   that, that you are willing to put all your eggs in that basket

11   or you would want the second bite with regard to other terms,

12   other Markmans, other infringement motions -- noninfringement

13   motions.

14          MR. JONES:  I know I can't be quoted on this, but

15   let me tell you I am going to give you my impressions.  Can I

16   move off from talking as a representative of the defendants

17   and move to my impressions?

18          THE COURT:  All right.

19          MR. JONES:  And this is Mike Jones's impressions.

20   Mike Jones's impressions are, Your Honor, that, you know,

21   there is going to have to be a reasonable limit on the claim

22   terms you construe in this case.  There has to be.

23          THE COURT:  There will be.

24          MR. JONES:  Yeah.  That is true.  It matters on

25   other areas in this case, too.  So my idea is this:  Mike

1    Jones's impression is I am certainly going to tell my clients,

2    look, let's get down to what really, really matters; and if

3    there are three claim terms that are most important, I am

4    going to encourage them unless they have something

5    individually that is really off the wall, that we stick with

6    just the three claim terms for claim construction.

7             I would be surprised if most of the defendants

8    weren't really minimalistic in the claim terms that they

9    wanted you to do.  I think there are a few defendants out

10   there, my impression is, that think they have very individual

11   defenses that they would want to save the right to come back

12   with some others.  That is what I think you are going to

13   hear.

14            If the Court puts people to, you know, well, I will

15   do this plan but you are going to have to limit it to three

16   and not have another Markman, it is probably a close issue how

17   that comes out.

18            I would also say this about efficiencies:  There is

19   no way we can try this case as it is currently structured, I

20   don't think.  Maybe I am wrong.  I guess I shouldn't have said

21   that.  The Judge will make that decision.  I will do whatever

22   you tell me to do.  But we are not going to have 149

23   defendants or 100 defendants in one trial.

24            I always try to look at these things, you know how

25   are we ultimately going to try it and then you can figure out

1   a discovery process and a case management process that makes

2   sense.  Right now I don't have a clue.  There is not that

3   grouping that we see in other cases.

4           So to me the inefficiencies that were being

5   complained about with regard to this summary judgment process

6   has been caused by the fact that these -- it has been filed

7   the way it has been filed.  We know to try it, we are going to

8   have to break it down some day.  That has to happen.

9           Now, my encouragement to the Court is, well, let's

10  break it down with the way we do our case management and bring

11  efficiencies to the process for the breaking down that we know

12  inherently is going to have to occur in this particular case.

13          The first thing I was suggesting was let's deal with

14  common issues first.  And with regard to the trial of the

15  common issues, if we decide to have a common issue trial on

16  what the material facts are, I think if the Court moved

17  forward with that, we would all have to be bound by what

18  happened to those common issues.  I think that has to occur,

19  and I do think it brings efficiency to the process.

20          The thing that I don't think you are going to see

21  the defendants want to do, because there are some that have

22  separate individual defenses that they want to keep and they

23  want to make, I don't think -- Mike Jones's impression is you

24  are never going to get all of the defendants to say they are

25  going to give all those up; that they do have those and they

```
 1    can't give those up.  But we do bring some efficiencies to the

 2    process by dealing with collective issues first.

 3              THE COURT:  Yes.

 4              MR. SOBEL:  Your Honor, at the risk out on a limb --

 5              THE COURT:  State your name.

 6              MR. SOBEL:  Jonathan Sobel from **Sobel & Keller.

 7              THE COURT:  If you can go to the podium so the Court

 8    Reporter can hear you.

 9              MR. SOBEL:  Yes.  I kind of wish someone else would

10    stand up and possibly make the point I'm about to make, but

11    we'll see.  I'm not the most knowledgeable in this room about

12    the technology.  But I feel as I am sitting here that perhaps

13    there could be a little more context to what this patent is

14    about to give some context to why an early summary judgment

15    motion would not be very fact intensive, would not need to

16    necessarily go even beyond the infringement contentions, and

17    would not create a situation where it would be unreasonable

18    for the rest of the case to go on as usual after the initial

19    summary judgment motion.

20              This is one of those cases where if you look just at

21    the infringement contentions, most -- the bulk of the

22    defendants are out if a few claim terms are construed a

23    particular way and what would be required in terms of facts

24    and the fact intensiveness to do that.

25              These -- to back up, Mr. Bosy gave -- well, not to
```

 1    be critical -- an overly simplistic view of this patent.

 2              And with apologies to everybody if I get this wrong

 3    as well.

 4              The patent had its day.  The invention had its day.

 5    And, perhaps, Your Honor was quizzical as to why you have an

 6    invention from the year 1999 and now you are suing in 2010 and

 7    it was issued in 2002, why did you wait eight years?

 8              This invention had a time, had its day.  And that

 9    day, you can remember back when you first had a PalmPilot, and

10    they were called PalmPilots and they had very little memory.

11    And then with over the Internet was not what it is today.

12              So it was important back then that when a client

13    device, a handheld device -- you can call it a PDA or a

14    PalmPilot or a phone or a computer; but that device that is

15    calling up the server, it was important that there be less

16    back-and-forth to get the information you wanted.

17              So what the patent said and during the prosecution

18    the patentee said was I'm going to do it in one

19    transmission -- it is like Name That Tune -- I'm going to do

20    it in one transmission.

21              You are going to have a request from a client

22    device.  Let's say I want to buy shirts.  I'll use Mr. Bosy's

23    example.  I want to buy shirts.  In response to that request,

24    the server has to send back two things, has to send back, we

25    will call it functionality and we will call it data.  The data

 1    is the data you want about the shirts.  The functionality is

 2    that applet or whatever, some computers -- some functionality

 3    that allows the client device to review and act upon that

 4    data.  So there was one request and one transmission back of

 5    both the functionality and the data.

 6           Now, the patent talks about a dynamically generated

 7    applet in response to a request.  In that context what happens

 8    is a request and that Applet, whatever an Applet is, has to be

 9    generated on the fly.  That is what the inventor used in his

10    invention document.  We are going to generate on the fly a

11    brand new applet.  That applet is going to be sent back.  With

12    that applet -- preloaded in the applet is going to be some

13    data as well.  One shot.  One shot.

14           It turns out these days -- and, again, I am not the

15    tech guy in the room; but it turns out these days most of

16    these back-and-forth Internet systems use what they call a

17    cascading function, a multiple back and forth.

18           Okay.  So you make a request, you get back

19    something, you look at -- the client device looks at it, goes

20    back and requests the data.  Maybe goes back and requests some

21    more data.  Because these days the client devices have a lot

22    more memory power.  The bandwidth is a lot greater, and there

23    is no longer a need on the one hand and there is just the

24    reality is it is not done this way, to have everything come

25    back dynamically generated after each request and/or to have

1    it come back -- "it" being the functionality and data -- come

2    back in response one time -- sorry, together in response to a

3    single request.

4            What is my point?  The point is, if you look at

5    their infringement contentions, they highlight what they think

6    the dynamically generated applet is.  And in many respects and

7    from many defendants, it is this JavaScript.  And they

8    highlight the data elements.

9            And you can see very easily apparently in most all

10   of the defendants' websites, whether -- what the flow of

11   information is.  What is the flow of requests?  What is the

12   flow from the initial request?  What is the flow back?  Is

13   there a second request?  Is there a third back?  You can see

14   that, without taking a whole lot of discovery.  Sorry.  You

15   could potentially see that without any discovery.

16           So this is not a case where we are going to have all

17   sorts of fact issues and the defendants are getting a second

18   bite at the apple and then we are litigating again.

19           The other unrelated point I want to make is this --

20   I just can't help but feel this way:  They have sued 120

21   defendants.  From their perspective what is the big deal in

22   having these issues -- or what is unfair, rather, about having

23   these narrow issues addressed at the start and if they feel so

24   strongly and they want to haul 120 defendants in here, my

25   clients shouldn't be with all these defendants.

1          We have no common transaction and occurrence.  We

2     shouldn't be with them, frankly.  But we are here.  So they

3     should have to do it at least -- so what is the big deal if

4     they have to do two Markman's now?  The Court with all due --

5     I acknowledge that there is two Markman's potentially for the

6     Court to have.

7          But, you know, this is not -- speaking for my own

8     client -- this is not a case where there are 50 claim terms.

9     Even if you took all of the defendants together, I'm going to

10    go out on a limb and say this is -- that whether there is a

11    second Markman and people want to reserve their rights, to put

12    it in context there is a general consensus among the

13    defendants there are this narrow set of terms that we will

14    agree -- among so many different defendants will agree to

15    narrow it to three.  Have it all done just like that.

16         THE COURT:  Okay.  Thank you.

17         MR. SOBEL:  Thank you, Your Honor.

18         THE COURT:  Mr. Jones, what about the second issue

19    that Mr. Bosy had raised about the going with the bellwether

20    defendant; that defendants would pick their best

21    noninfringement defendants.  He said he would be interested in

22    talking with you about that I think.

23         MR. JONES:  Yeah, I think the key there is finding

24    somebody willing to do it, Your Honor.  I mean, again, being

25    totally open, you know, and knowing this can't be used, I will

1    just tell you, we are dealing with a defense group, nobody

2    want to do something like that.  There are very few, as you

3    and I know, Intels in the world that say we want to go first.

4           What drives that is almost the corporate culture and

5    a defendant that has the confidence that they want to, you

6    know, stand up for the industry and take the lead.  I think

7    that is going to be much more of a driving fact on who we can

8    get to do that than evaluating the strategic aspects of the

9    case.  So I guess that is my response to that.

10          THE COURT:  Okay.

11          MR. JONES:  Obviously, I think those considerations

12   we have made -- if I can comment, I may have misspoken, I have

13   a note here.  You know, our proposal is that when we try the

14   common issues, if we did our proposal, those issues are dead,

15   they are gone.  Now, individual defendants would reserve their

16   individual issues.  But our proposal is that you only do the

17   common issues once.

18          THE COURT:  Are you talking about common issues of

19   fact?

20          MR. JONES:  Right, common issues of fact.  When we

21   make the common motion for summary judgment, if you were to

22   decide there is a material fact issue here we need to decide,

23   we need to have a trial on and that is what is going to decide

24   this case with regard to infringement, that then if you did

25   that common trial, that certainly would decide that issue for

```
 1    everybody.
 2              THE COURT:  Okay.  So if there is a fact issue, then
 3    we are having a common trial on that fact issue that would be
 4    binding with a jury and everything?
 5              MR. JONES:  Exactly.
 6              THE COURT:  That would be binding on all of the
 7    defendants?
 8              MR. JONES:  With regard to the common fact.
 9              THE COURT:  Once that got resolved, we would still
10    be looking at Markmans and discovery and damages and
11    individual infringement issues and invalidity issues.
12              MR. JONES:  Right.  But what I would encourage the
13    Court to think about is I think you then have given defendants
14    who have been sued in a forum like this, an opportunity to
15    present the common defenses in a cost-efficient fashion, so
16    that at least with regard to those common issues, that they
17    have been able to present those, have their day in court
18    without being forced to settlement based on cost of defense
19    and what ultimately is going to occur in the case.
20              I think that is a huge benefit.  I think when the
21    plaintiffs --
22              THE COURT:  What does that do for the plaintiff
23    though?
24              MR. JONES:  Well, the plaintiff gets to have the
25    benefit of suing 149 people all at once, which is a tremendous
```

1    efficiency to the plaintiff.

2              To the defense and to the defense group, you know,

3    Judge, you just don't know how many hours it takes for me to

4    make the limited agreements I just made to you on behalf of

5    all these folks.

6              THE COURT:  Are you going to go into mediation as

7    your next career?

8              MR. JONES:  We talked for hours, we talked for hours

9    about claim terms.  You know, you sit -- you don't want to

10   hear about it.  Let me tell you, the inefficiencies that are

11   brought to the judicial system by suing this many defendants

12   at once, the burden that is placed on the defendants are

13   immense.

14             There are tremendous efficiencies to the plaintiff.

15   All I am trying to do is suggest a way to bring some

16   efficiency to the defendants, which I think is only fair.

17             The other thing that I would like to address is the

18   Markman issue.  Now, at least for a significant number of

19   defendants it has been whispered in my ear that if the

20   plaintiff would limit themselves to, say, three claims, that

21   it may well be that defendants can limit themselves to three

22   claim terms for the whole case.  So limiting the claims might

23   bring order to that process also.

24             Thank you, Your Honor.

25             MR. BOSY:  Your Honor, if I might briefly respond.

1   You asked a question are you willing to put all your eggs in

2   one basket?  And I think in the last 15 minutes we have heard

3   the answer to that.  The answer is, no, they are not willing

4   to do that.

5           THE COURT:  Let me ask you this:  If you are willing

6   to put so many eggs in the basket, are you willing to tee up

7   this issue that is obviously of great importance to them that

8   they are saying in their belief it will make the case go away?

9   Your belief is it won't, that there is then going to have to

10  be inefficiency to it.  I would take it if you prevailed on

11  that, the value of your case might well go up, might it not?

12          MR. BOSY:  Well, that's I suppose not what we are

13  hearing.  They are saying that they have got these good

14  noninfringement arguments.  If there are fact issues there, we

15  have a trial on that, you would have to construe those claim

16  terms?

17          Then they are saying but if we lose on that, we have

18  got a whole bunch of other defenses.  We have got other

19  noninfringement defenses.  We have other claim terms we would

20  want construed in our favor, and then we move on to

21  invalidity.  They would want to argue invalidity.  So in a way

22  we are adding another complexity to the case by doing this.

23          Now, if they want to put all of their eggs in one

24  basket, we are certainly willing to look at and reduce the

25  number of claims in this case.  It has always been our

1    intention.

2          THE COURT:  Can you reduce your number of claims to

3    three if they will agree there is only going to be three claim

4    terms.

5          MR. BOSY:  Let me go back and look at that.  I can

6    certainly reduce the number of claims.  I do need to see what

7    the issues are, but I can reduce them substantially.  Again,

8    it has always been our intention to do that.  We have got 15

9    claims here now.  It is not my intention to go to trial on 15

10    claims.

11          THE COURT:  Okay.  We are going to break for lunch

12    here in a minute, and let me encourage you to look at that.

13    And then when we come back from lunch, tell me whether you can

14    make that agreement or not.

15          MR. BOSY:  All right.

16          THE COURT:  Did you have anything else to respond to

17    that has just been said?

18          MR. BOSY:  Yes.  And let me just respond to this

19    contention that a good noninfringement argument is that the

20    accused devices provide more than one transmission to the

21    personal computer.  And because they provide more than one

22    transmission, the argument now is that doesn't infringe.

23          Let me just read a little bit from the patent.

24    First of all, the word "one" is not in any claim.  Here is

25    what the patent says:  By transmitting the appropriate data

1    and associated data handling capabilities as a group, the

2    client may be required to communicate over a low-speed

3    communications link a greatly reduced number of times or in

4    some cases, only once.  That is Column 3, Lines 13 to 17.

5              So what that says is, sure, the transmission could

6    be one, and sometimes that is what you want; but it could also

7    be multiple transmissions.  So the idea it could only be one,

8    they are just reading a limitation into the claim.  And we all

9    know you can't do that.

10             THE COURT:  I appreciate that.  We will save all

11   that for Markman.

12             Let me -- I would like to go on here for a few

13   minutes.  One thought that I had had prior to this hearing,

14   and I am just going to throw it out there as food for thought,

15   and I had the same question --

16             And perhaps you answered it, Mr. Jones.

17             And, Mr. Bosy, you may want to respond to it.

18             Let me run through my scenario.  Can these

19   defendants be grouped, and perhaps allowing plaintiff to group

20   them into three or four groups, some manageable group based

21   upon functionality of accused products or something of that

22   nature?  But I heard Mr. Jones saying it is really not going

23   to be that helpful.  Do you agree with that?

24             MR. BOSY:  Yes, I do.  The reason that I agree with

25   that is what the defendants themselves have said.  For

1    example, if you have got, say, a group of retailers there

2    really isn't any reason to believe that that group would have

3    a common interest as distinguished between say automobile

4    companies or airlines.

5         They each seem to -- well, they try to differentiate

6    themselves from one another.  So I don't believe, as they

7    themselves have said, that grouping by defendants would really

8    be very helpful.  That is what we have always thought because,

9    you know, we have looked at this.  We have looked at their

10   websites.  I mean, as our preliminary contentions --

11   infringement contentions are some thousands of pages long with

12   exhibits and all sorts of detailed information.  You know, we

13   have done this work, and we just couldn't see how grouping by

14   defendants is going to help us.

15        THE COURT:  The next thought I had, and I have done

16   this in some other cases, would be if we did group them or we

17   didn't group them, then allowing the plaintiff to choose three

18   or four bellwether defendants it wished to go against and

19   simply staying everything as to every other defendant.

20        MR. BOSY:  That would certainly be of appeal to us.

21   That is to say, if we could choose three or four defendants

22   that we want to go against.  And if we won, everybody else

23   would be bound by that, that is certainly very appealing.

24        THE COURT:  Well, I'm not --

25        [Laughter]

 1            THE COURT:  -- I don't think I said that last part

 2    they would be bound by that.  I am speaking in terms of -- it

 3    has been my experience when I have done this that if plaintiff

 4    chooses wisely in what defendants that are representative and

 5    have substantial risk, that they are going to have the

 6    resources to put up a substantial fight, that usually if

 7    plaintiff prevails on those cases, that the others will be

 8    inclined to settle and resolve the case, but not necessarily

 9    they would be bound by it.

10            In other words, I guess what I am saying is, under

11    that scenario I would think if you prevailed against some

12    bellwether defendants, that the price of poker has just gone

13    up; and your licensing strategy may have more value to it than

14    it does now.

15            MR. BOSY:  It may have that effect.  It may have the

16    effect, on the other hand, of allowing the other 122

17    defendants to dig in and look up -- come up with new defenses.

18            THE COURT:  Oh, yeah.

19            MR. BOSY:  New noninfringement defenses, new

20    invalidity arguments.  I mean we have already got 78 prior art

21    references, and I think we know more are coming in.

22            We have also heard from the defendants that they

23    have, you know, a very personalized view of what -- perhaps

24    what the best prior art defense is.  So whatever we do with

25    four bellwether defenses, there is going to be -- cases, there

1    is going to be a lot of new arguments coming up.  And I know

2    that lots of defendants have quite a strong disagreement on

3    what prior art is.

4           If four defendants put in what they think the best

5    prior art is, then what we are going to hear and what I have

6    heard is, well, they used the wrong prior art defenses, we

7    have got better ones, so this doesn't mean anything to us.

8           THE COURT:  Okay.

9           MR. JONES:  Can I give you a reaction to that, Your

10   Honor?  And first I need to do apologize to Mr. Bosy.  I

11   called him Mr. Rosen to start out with.  I apologize.  I was

12   at my hearing last week, so I was brain dead and I apologize.

13          THE COURT:  We all have those mind lapses.

14          MR. JONES:  But having said that --

15          THE COURT:  I noticed on the Academy Awards the

16   actor that couldn't remember his wife's name when he was

17   thanking her.  "My lovely wife..." and then he couldn't think

18   of here name.

19          MR. JONES:  Your Honor, my wife's name is Pam.

20      [Laughter]

21          MR. JONES:  If everybody can remember I knew that.

22          You know, I really -- and, again, I'm being open --

23   I don't think that is going to be very helpful in this case.

24   I can agree with you.  I think basically you would have a lot

25   of defendants that say we're stayed, we're on the sidelines,

1   we don't even want to talk anymore.

2           I think the other issue you have is, you know, you

3   have a lot of different law firms involved.  They are all

4   going to think we can do better than those guys did.  You

5   know, that is going to be a reality.  Particularly, if the

6   plaintiff chooses.  I mean, if the plaintiff chooses there is

7   going to be a whole a lot of criticism with the bellwether

8   case just there.  We were different, we were a better defense

9   team.

10          THE COURT:  What if I let the plaintiff choose two

11  or three and the defendants if they have two or three that

12  want to volunteer -- or, well, let me ask that.

13          This isn't binding on your clients, but how many

14  defendants if they had the choice between being in that first

15  group or sitting it out for the second group, how many

16  defendants would want to come into the first group?

17          One, two, three.  Anybody else?

18          How many defendants would want to just lay back and

19  see what happens in the first group?

20          How many are just happy to be here?

21          MR. JONES:  I think that kind of answers your

22  question.  I think it also agrees with Mr. Bosy's statement

23  that we really wouldn't advance the ball that far if we do

24  that.  So that would be my concern.

25          THE COURT:  Let me ask you this question next to

1   both sides:  If the Court went with a limited number of claim

2   terms if you can -- if we went with a limited number of claim

3   terms, a limited number of Markman terms to interpret and in

4   that manner, what type of time table, how fast of a time table

5   could that be on for the plaintiff?  Because I know from the

6   plaintiff's standpoint time is money.  They want to hang onto

7   their Markman date on the whole case and their trial date on

8   the whole case.

9        I guess my question is, could we hang onto that plus

10  this abbreviated Markman -- I know you don't want to do it;

11  but if you had to, could that get done in the interim?

12       MR. JONES:  I think we could be ready to go on that

13  interim Markman 60 days.

14       MR. BOSY:  I think it would take a little longer

15  than 60 days.  It depends on what discovery could be needed,

16  but I do believe that procedure could be worked into the

17  present schedule.

18       THE COURT:  Do you believe it could be worked into

19  the present schedule?

20       MR. JONES:  Certainly.  We don't believe there is

21  really a lot of discovery that is needed on any of this on our

22  plan, but we also want to be reasonable, you know, if they

23  want some --

24       THE COURT:  What would happen to the rest of the --

25  the rest of the discovery and other aspects of trial

1   development would be stayed pending that?

2          MR. JONES:  That is our suggestion.  That is

3   obviously our plan.

4          THE COURT:  Plaintiffs?

5          MR. BOSY:  Right now I don't think that is a good

6   idea for us to commit to that.  And, again, the reason that I

7   say that is because we will reduce the claims, they will

8   present just a few noninfringement arguments, we would go

9   through that whole process.  If they lose, we are back to

10  square one.  Then, you know, we are back to square one.  We

11  have lost our Markman date.  We have lost our summary judgment

12  date.  We have lost our trial date.

13         And as I said when I first started here, it is our

14  intention to try to keep those dates if we can.

15         MR. JONES:  Our plan is not to deviate from those

16  dates.  Our plan was to try to work up something in the

17  current schedule.  This is not a veiled motion for

18  continuance.

19         We also believe the 3-3's and 3-4's take care of the

20  discovery that is really needed with regard to the issues that

21  we are trying to raise.

22         THE COURT:  All right.  I have been reminded that I

23  have a number of sentencings at 1:30, so I don't think we are

24  going to have time to come back after lunch.  Well, let's --

25  gosh, we are running out of time.

 1              Very briefly on the bifurcation of damages and
 2    liability, let me hear your spin on that.  I have read the
 3    papers on those.
 4              MR. BOSY:  Right.  Where we were in the 111 case, we
 5    filed a motion.  It was agreed.  Then Your Honor asked us all
 6    to respond with respect to all of the other defendants.  That
 7    has been done.
 8              All of the other defendants except for seven have
 9    agreed that bifurcation is a good idea.  So the vast majority
10    of people in this room agree that bifurcation is a good idea.
11              THE COURT:  Why is it a good idea?
12              MR. BOSY:  It is a good idea because what is going
13    to drive this from everybody's perspective, is liability;
14    probably noninfringement arguments.  If we win on those
15    arguments, there is a high likelihood that cases will settle
16    out.  You know, that is what we feel.  They feel the same
17    thing.  We all agree to that.
18              So it is going to -- it would provide efficiencies.
19    We wouldn't have to go through damage discovery and experts
20    and all of that.  We don't want to do that, and they don't
21    want to do that if we think we could avoid it.  And certainly
22    we think, you know, there will be a lot of cases that will
23    settle out if we win, and we are not going to have to do that
24    with those defendants.
25              So that is really the principal factor that almost

```
1   everybody in this room agrees to.  It is also a good idea from

2   a trial management standpoint to separate a damages trial,

3   should there ever have to be one, simply, if for no other

4   reason, to avoid jury confusion that would be caused by trying

5   liability, noninfringement, invalidity, and damages all

6   together.  So that I think was our collective belief.  You

7   know, that is the basis upon which we almost all agree.

8           Now, having said that, we, of course, also all do

9   know that bifurcation is not the general rule here.  We know

10  that.  But we do believe that it is a good idea in this

11  case -- probably not in many others but in this case -- having

12  said that, I will also say should the Court decide not to

13  bifurcate, plaintiff is prepared to go ahead with damages in

14  accordance with the Court's schedule.  In other words, we are

15  not going to need any more time.  We will be ready to go.  So

16  whichever way the Court rules, we are ready to adhere to the

17  Court's schedule.

18          THE COURT:  Mr. Jones.

19          MR. JONES:  Obviously, most of the defendants agree

20  with the bifurcation.  In the interest of time, I will turn it

21  over to Mr. Brann who will speak for those that don't agree to

22  it.

23          THE COURT:  Okay.

24          MR. JONES:  Thank you, Your Honor.

25          MR. BRANN:  Thank you, Your Honor.  Peter Brann.  I
```

1    represent Coldwater Creek, Hasbro and J. Jill.  As you have

2    heard, most of the people in the room support bifurcation.  We

3    are in that minority.

4           Before I start I wanted to say quickly that we

5    believe -- we believe with the points that Mr. Jones has made

6    earlier today with regard to efficiency.  And, indeed, this is

7    not a "we are opposed to efficiency."  Our problem with the

8    motion to bifurcate is if the rifle shot that was being

9    described by Mr. Jones is rejected or some of the other things

10   that the Court is contemplating, that bifurcation doesn't give

11   you the efficiencies that you really are looking for and what

12   you really need here.

13          Indeed, what was alluded to, bifurcation is a

14   discretionary call.  The exception and not the rule.  We don't

15   think it really works here.  And, indeed, the description from

16   Mr. Bosy this morning I think really underscored for me why it

17   is that there is really not a damages model.  That is one of

18   the things we are very interested in.

19          (THIS PORTION OF THE RECORD SEALED BY ORDER OF THE

20          COURT AT DOCKET NO. 338 AND FILED UNDER SEPARATE COVER.)

21          MR. BRANN:  Indeed, some of the other comments this

22   morning underscore what is really being sold here when you

23   have 124 defendants in the same case in which what you are

24   being sold is substantially less to settle with us than to go

25   to trial.  It is not:  We have a theory against Hasbro or any

1    of these other folks that gets you to 200,000 or $20 million

2    or pick a number out of the sky.

3              Our concern is that this case shouldn't just be

4    about avoidance of cost of defense.  More importantly for the

5    present purposes it doesn't address the efficiency issue.

6    That is, because what we are really talking about is after we

7    have heard, oh, we really want to go forward from the plan.

8    This, this, and this.  We don't really want to lose our date.

9    We don't want to lose that and that and that.

10             Well, the answer is bifurcation means you are going

11   to have two proceedings.  That is, you are going to go all the

12   way through on the first one and then you start over and then

13   evaluate it in terms of the damages later on, and you find out

14   whether or not there is actually a damages theory.

15             We would submit that there actually isn't one that

16   would apply, and that would become fairly obviously if they

17   had to do it.  So if the Court isn't prepared to go with one

18   of the efficiency prospects that we have abdicated, that the

19   defendants collectively have abdicated, we don't think

20   bifurcation provides that answer.  It gives you two

21   proceedings and allows the plaintiff in our judgment to hide

22   the ball on what this case is.

23             THE COURT:  Okay.  Thank you.

24             MR. BRANN:  Thank you.

25             THE COURT:  I had one more question for plaintiff I

1   wanted to ask, though.  We have got 124 defendants in this

2   suit.  How many more are there out there that you are

3   contemplating suing?

4           MR. BOSY:  Your Honor, let me answer that frankly.

5   There are many more out there.  We are not at present time

6   contemplating suing them.  It is our goal and wish to finish

7   this case before anything further goes on.  That is our wish.

8           THE COURT:  Okay.  Thank you.

9           Yes, sir.

10          I just need 30 seconds.

11          THE COURT:  Okay.

12          MR. BOSY:  May I interrupt?

13          THE COURT:  Yes.

14          MR. BOSY:  The settlement terms, I want to remind

15  everyone, are confidential.  The Dell settlement terms have

16  been mentioned in open court.  And I have an agreement with

17  Dell not to disclose that to anyone.  That's what they wanted,

18  so I just want --

19          THE COURT:  Are you making a motion to seal those

20  settlement terms --

21          MR. BOSY:  Yes.

22          THE COURT:  -- or redact those?  That is granted.

23          What else?

24          MR. TOLLEFSON:  Thank you, Your Honor, Brian

25  Tollefson with Rothwell, Figg.  We represent LG Electronics,

```
 1   USA.

 2              THE COURT:  Excuse me.

 3       (Discussion between the Court and the Court Reporter.)

 4              THE COURT:  You want it redacted or sealed?

 5              MR. BOSY:  That would be better redacted.

 6              THE COURT:  All right.  Just redact that.

 7              MR. TOLLEFSON:  All right.  We join with Mr. Brann

 8   on the opposition of the bifurcation.  I just want to add one

 9   small point.  LG, like Hasbro, has no sales.  Their website is

10   not used to sell any products.

11              And Mr. Bosy mentioned the range of 200 to 500,000.

12   He said the high range -- I might have gotten this wrong --

13   was for product sales of, say, $200 million a year.  And low

14   range of 200,000 was, say, ten million a year.

15              We have no sales, and it would be completely unfair

16   for LG to not be able to take any discovery on damages and

17   obtain their damages theory.  We are going to spend more on

18   electronic discovery than the low range.

19              And the last thing we want -- Mr. Bosy mentioned

20   jury confusion.  The last thing we want is to be in a separate

21   damages trial with Amazon when we don't have any sales.

22              THE COURT:  Okay.  Thank you.

23              All right.  Anything further?

24              Very well.  I thank everyone for a very helpful

25   discussion.  The Court will enter an order shortly.
```

 1               I would like to hear -- when can I hear back from

 2   you with regard to whether you accept defendants' proposal of

 3   if you will limit the three claim terms, then they will also

 4   limit all defendants?

 5               That was the offer, wasn't it, Mr. Jones?

 6               MR. JONES:  It was -- well, let me --

 7               THE COURT:  Everybody sit down again.

 8               Why don't you articulate?

 9               MR. JONES:  Yes.  I knew a number of defendants

10   would enter into that deal.  I know -- not all.  I know a

11   number of defendants would say they would limit it to three

12   claim terms -- if we could limit it to three claim, we could

13   get down to three claim terms.  Is that correct?  Am I saying

14   it right?

15               MR. MOORE:  I would say the defendants would

16   consider if there was going to be something to streamline them

17   for the amount of terms for claim construction limited to,

18   which seemed very important to the plaintiff, then the

19   defendants would like something in return for that which may

20   be limited the number of claims.  I don't want to lock

21   ourselves into three and three, but the plaintiff and

22   defendants can negotiate what may make sense and streamline

23   the procedure.  One thing maybe --

24               THE COURT:  You have had months to negotiate.

25               MR. MOORE:  That proposal has to be discussed.  And

 1    while we have the defendants together, we can use the

 2    courtroom right after this.

 3              THE COURT:  Let me suggest this then:  Y'all visit

 4    about that.  My sentencings are at 1:30.  I will come back

 5    about 1:20.  And if you would like to stay, you are all

 6    welcome to come back, or if you make a decision -- and I will

 7    excuse anyone that doesn't wish to be here as long as Mr.

 8    Jones has your permission to speak for you with regard to this

 9    one discrete issue.  Okay?

10              MR. JONES:  Thank you, Your Honor.

11              THE COURT:  See you at 1:20.  Be in recess.

12        (Recess was taken.)

13              THE COURT:  Please be seated.

14              I actually thought I was walking into the

15    sentencing.  It is a nice-looking group of criminal

16    defendants.

17        [Laughter]

18              THE COURT:  Have y'all had a chance to meet and

19    confer?

20              MR. BOSY:  We have a position, Your Honor.  For the

21    procedure Your Honor had asked us about, we would propose five

22    claims and five claim terms for defendants.

23              The timing proposal is this:  We would give them our

24    claims on March 15th, and they would give us their

25    construction a week later.  I think that is enough time for us

 1    to talk with their experts and our inventor and try to decide

 2    which claims we want to use, and a week should be good enough

 3    for them because it sounds like they pretty much know what

 4    they are going to do, but I think we should have a time to at

 5    least exchange.  Otherwise, it could got on for a long time.

 6    That sounds like a good thing to me.

 7              Then what I would suggest is once we get those

 8    exchanges, we take a look at it, decide whether we need

 9    discovery, decide how we want to proceed, what kind of

10    briefing we need, and then get together and make a submission

11    to the Court with the suggestion as to what we want to do;

12    when the briefs will be filed, how long they would be, whether

13    affidavits are needed and so forth.

14              THE COURT:  Briefing with regard to?

15              MR. BOSY:  Well, the issue of claim construction.

16              THE COURT:  Okay.

17              MR. BOSY:  And their noninfringement arguments.

18              THE COURT:  Okay.  All right.

19              MR. BOSY:  I take it Your Honor would want briefs on

20    that.

21              THE COURT:  Oh, yes.

22              All right.  Mr. Jones.

23              MR. JONES:  I specifically want to answer the

24    question the Court left with me.  And I do have a specific

25    answer, and unfortunately the defendants could not agree to

1    the deal, which would be they limit themselves to three

2    claims, we limit ourselves to three claim terms.

3           There was some interest in that.  I would say the

4    biggest problem was getting back to clients as many clients as

5    was involved and committing themselves to that in its

6    entirety.

7           But I don't know that we would ever get there on all

8    these defendants.  I think the answer to that question was,

9    no, to that commitment.

10          With regard to this proposal about early -- I think

11   it is early Markman, basically, is the way I understand this

12   proposal.  I don't -- having heard that, I don't have a

13   definitive position from all of the clients because,

14   unfortunately many of those defendants left when we were

15   answering the first question.  But I think as far as an

16   earlier Markman process, I think there is interest on the

17   defendants' part with regard to that.  I think definitely that

18   is true.

19          THE COURT:  But all defendants did agree that if

20   plaintiff agrees by March 1 to -- did you say March 1?

21          MR. BOSY:  March 15th.

22          THE COURT:  March 15th.

23          MR. BOSY:  Yes.

24          THE COURT:  March 15th to identify and limit their

25   action to five claims without any right to proceed on the

 1   other claims later, right?

 2          MR. BOSY:  Right.

 3          THE COURT:  That defendants would agree to then

 4   identify five claim terms that they want the Court to

 5   construe; and that that would be the limit of the claim terms,

 6   right?

 7          MR. JONES:  No, that agreement was not reached, Your

 8   Honor.  In fact, that proposal has not been made while the

 9   defendants were even still here.  We dealt with the first

10   proposal that the Court made.  And you instructed all of the

11   defendants not to leave until I had their authority to answer

12   that question.  I do, and unfortunately the answer is no.

13       Now, this proposal, which has not been made to all of

14   them -- in fact, has been made to us very, very recently --

15   within minutes -- I think there well may be some interest in

16   that.  But I do not have authority to bind the various

17   defendants nor probably even my clients now.

18          But I would be happy to get back to the Court with a

19   response to that if you could give us, say, a week.  With this

20   group, it is just unwieldy to get them all together.  If I can

21   get them together as quick as I can and give you a response to

22   this proposal.

23          MR. BOSY:  Yes, Your Honor.  That sounds like a good

24   way to start.  If the defendants could get back to, say, my

25   suggestion, five claims, five claim terms, if that works then

1   we can agree on an exchange date --

2            THE COURT:  Then there would not have to be a second

3   Markman, right?

4            MR. BOSY:  Right.  We would agree on an exchange

5   date and decide amongst ourselves how many pages of briefs we

6   need and so forth, make a proposal to the Court for briefing.

7   And that is a way to get this going forward.

8            THE COURT:  And if defendants cannot agree to that,

9   what is plaintiffs' position at that point?

10           MR. BOSY:  Well, if plaintiffs (sic) cannot agree to

11   that, I suppose we are back to the Court's schedule in the

12   usual case.  And absent another proposal from the defendants,

13   I don't know what else to do.

14           MR. JONES:  Again, I don't have the authority, Your

15   Honor, to bind anybody.  I think there would be interest on

16   the defendants' part to discuss that.

17           THE COURT:  Okay.  All right.  Let's see, today is

18   Monday.  Can you get back with us by, say, noon on Monday next

19   week?

20           MR. JONES:  Today is Tuesday, Your Honor.

21           THE COURT:  Time flies.

22           MR. JONES:  I don't even know people's names.  By

23   noon on Monday I think is doable.

24           THE COURT:  Notify us if you have an agreement.  If

25   you don't, the Court will proceed and enter an order.

1                Thank you.

2                MR. JONES:  Thank you, Your Honor.

3                MR. BOSY:  Thank you.

4            (Proceedings concluded.)

5

6                    C E R T I F I C A T I O N

7

8    I certify that the foregoing is a correct transcript from the

9    record of proceedings in the above-entitled matter.

10

11

12   /s/ Shea Sloan

13   SHEA SLOAN, CSR, RPR
     OFFICIAL COURT REPORTER
14   STATE OF TEXAS NO. 3081

15

16

17

18

19

20

21

22

23

24

25